**\*NOT FOR PUBLICATION\***

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| RAMONA CHAMBERS,<br><br>      Plaintiff,<br><br>v.<br><br>KILOLO KIJAKAZI,<br>Acting Commissioner of Social Security,<br><br>      Defendant. | Civil Action No. 21-20678 (FLW)<br><br>**OPINION** |

**WOLFSON, Chief Judge:**

Ramona Chambers ("Plaintiff") appeals from the final decision of the Acting Commissioner of Social Security, Kilolo Kijakazi ("Defendant"), denying Plaintiff's application for disability under Title II of the Social Security Act (the "Act"). After reviewing the Administrative Record ("A.R."), the Court finds that the Administrative Law Judge ("ALJ") failed to adequately consider the medical opinion of Plaintiff's neuropsychologists with respect to Plaintiff's cognitive abilities and limitations. Accordingly, the ALJ's decision is **REVERSED**, and Plaintiff's claim is **REMANDED** for further consideration consistent with the findings herein.

## I.   FACTUAL AND PROCEDURAL HISTORY

Plaintiff, born on March 14, 1968, was 50 years old on her alleged disability onset date of June 25, 2018. (A.R. 32, 294.) Before the onset of her alleged disability, Plaintiff had worked as a middle school special education teacher for 18 years. (A.R. 299.) On May 20, 2019, Plaintiff filed a Title II application for a period of disability and disability insurance benefits, alleging

disability due to non-Hodgkin's lymphoma, cognitive disfunction from chemotherapy, lupus, and Sjogren's syndrome. (A.R. 62, 298.) The application was denied initially on June 26, 2019, and upon reconsideration on August 12, 2019. (A.R. 75, 101–03.) Plaintiff then filed a written request for a hearing before an ALJ, which was held via video teleconference on April 30, 2021. (A.R. 21, 41.) On June 14, 2021, the ALJ determined that Plaintiff was not disabled at any time from Plaintiff's alleged disability onset date through the date of decision. (A.R. 33.) Following the ALJ's decision, Plaintiff sought review by the Appeals Council, which was denied on October 19, 2021. (A.R. 1–7.) Plaintiff now appeals the ALJ's decision under 42 U.S.C. § 405(g).

## A. Review of Medical Evidence

### i. Medical Records

The relevant period for Plaintiff's disability claim runs from June 25, 2018 to June 14, 2021, the date of the ALJ's decision denying disability insurance benefits. (A.R. 33–34.) Prior to that period, Plaintiff was diagnosed with and successfully treated for non-Hodgkin's lymphoma. Plaintiff's medical records indicate that she was treated for stage IV follicular lymphoma of the bone marrow in her thoracic spine with chemotherapy and radiation by physicians at Memorial Hospital for Cancer and Allied Diseases. (A.R. 431.) Following a mixed response to treatment with induction rituximab in 2016, on March 23, 2017, an MRI of Plaintiff's spine showed the continued presence of lymphoma in vertebrae T9 and T10. (A.R. 460.) On March 24, 2017, Dr. Carla Hajj, M.D., recommended Plaintiff receive three cycles of R-CHOP chemotherapy followed by radiation. (A.R. 467.) Plaintiff received chemotherapy between March 2017 and May 2017. (A.R. 28, 475.) After a PET scan indicated disease improvement, Plaintiff also underwent consolidation radiation therapy between May 25, 2017 and June 19, 2017,

which she tolerated well.  (A.R. 475.)

Treatment notes from immediately before and during the relevant period show that Plaintiff's physical impairments were stable.  On February 26, 2018, Dr. Charles B. Peeples, M.D., noted that Plaintiff's cancer was "dormant." (A.R. 883.)  Likewise, on May 16, 2019, Dr. Peeples stated that Plaintiff's cancer was "in remission." (A.R. 862.)  During this time, Dr. Deborah Alpert described Plaintiff's Sjogren's syndrome as "stable" and "mild." (A.R. 1051.) On October 23, 2019, Plaintiff received an MRI of her whole body, which was unremarkable. (A.R. 920.)  Dr. Alpert's progress notes from a February 8, 2021 appointment similarly indicate continued stability with respect to Plaintiff's physical ailments.   Based on that visit, Dr. Alpert noted that Plaintiff showed full range of motion of all joints, that Plaintiff's Sjogren's syndrome and lupus were both "stable," and that there was no evidence of disease with respect to Plaintiff's lymphoma.  (A.R. 1262–64.)

On December 12, 2017, Plaintiff presented to Memorial Hospital for Cancer and Allied Diseases for evaluation of memory loss.  (A.R. 450.)  Treatments notes indicate that Plaintiff did not work as a math teacher between March 2017 and September 2017 due to fatigue associated with her lymphoma treatments.  (*Id.*)  Upon her return to work, Plaintiff experienced "difficulty with remembering numbers, medications, [and] days of the week." (*Id.*)  Plaintiff also reported being "forgetful" at home and "tell[ing] her husband the same thing multiple times." (*Id.*) Although Dr. Anna Piotrowski, M.D., noted that Plaintiff's "bedside neurological exam" was "benign," Dr. Piotrowski ordered an MRI of Plaintiff's brain and a lumbar puncture, among other things. (A.R. 452.)  Dr. Piotrowski also noted "the possibility of neurotoxicity attributed to her chemotherapy" and recommended "neurocognitive testing." (*Id.*)

On January 26, 2018, Plaintiff reported for a follow-up appointment regarding her

cognitive issues at which she was informed that imaging tests and bloodwork did not indicate lymphoma or "show reversible metabolic cause of memory loss." (A.R. 456.) Dr. Piotrowski "recommended continued puzzles, active work, [and] socialization to prevent further memory decline." (*Id.*)

On April 18, 2018, Plaintiff presented for neuropsychological consultation at Neuropsychology Rehabilitation Services – Lifespan Behavioral Health ("NRS"). (A.R. 421.) Following examination in July 2018, Dr. Mihir Shah, Psy.D., Dr. Robert B. Sica, Ph.D., and Dr. Steven P. Greco, Ph.D., issued a report, which stated that Plaintiff's "neuropsychological findings reflected diffuse deficits consistent with cognitive dysfunction secondary to chemotherapy, an elevated psychological state and pre-existing, previously diagnosed [ADHD]." (A.R. 421–22.) Detailing their findings from the results of the Wechsler Adult Intelligence Scale, among other tests, the NRS team observed that Plaintiff's attention and concentration were impaired, including slow processing speed, low average verbal reasoning, and impaired visual reasoning. (A.R. 423.) Additionally, Plaintiff's "memory functioning . . . was one of her most salient impairments." (*Id.*) Plaintiff's full-scale IQ score was 80, characterized as "low average reduced by approximately 1-standard deviation below her estimated baseline functioning." (A.R. 422.) The NRS team further noted that "Psychologically, [Plaintiff's] profile was consistent with an adjustment disorder with mixed emotions. Her clinical profile reflected mild-to-moderate elevation with health concerns, worry, anxiety, and difficulty thinking clearly." (A.R. 425.) Recommendations included that Plaintiff "should apply for temporary disability and not return to work as a teacher" and that Plaintiff's "cognitive and emotional status will be monitored to determine a return to work status." (*Id.*)

On August 13, 2018, Plaintiff began treatment at NRS to address and improve her

decreased cognitive functioning.  (A.R. 953.)  Treatment notes from weekly sessions with Dr. Melissa Hillebrecht, Psy.D., indicate that Plaintiff's cognitive performance at these sessions ranged from "limited" to "adequate" to "variable."  (A.R. 785–95.)  During this same period, Dr. Peeples, Plaintiff's primary care physician, noted that Plaintiff's impaired concentration abilities were "improving on medication."  (A.R. 869, 871.)

On May 1, 2019, Drs. Sica, Greco, and Hillebrecht performed a repeat neuropsychological examination.  (A.R. 779.)  The associated report states that Plaintiff's "neurological findings remained unchanged with mild areas of improvement and decline."  (*Id.*)  The examination revealed "diffuse deficits" in terms of "attention-concentration, information processing, multitasking/mental flexibility, problem-solving, abstraction, logical analysis, spatial abilities, memory (Incidental, Verbal), and primary motor abilities," while "improvements were seen in visual memory."  (A.R. 783.)  Plaintiff's full-scale IQ score for this examination was 84.  (A.R. 780.)  The NRS team stated that Plaintiff "will experience problems with complex activities of daily living" and recommended that Plaintiff "apply for permanent disability and not return to work as a teacher."  (A.R. 784.)

### ii.  Medical Opinion Evidence and Prior Administrative Findings

On March 21, 2019, Drs. Greco and Hillebrecht drafted a letter detailing Plaintiff's "treatment for mild cognitive impairment and adjustment issues secondary to her diagnosis of follicular lymphoma/Large B Cell (T9-T10)."  (A.R. 1022.)  The letter stated that Plaintiff "demonstrated progress with cognition and emotional functioning," but "continues to experience problems with information processing, multi-tasking, and memory," which "adversely impact her daily functioning, exacerbating her emotionality."  (*Id.*)  Drs. Greco and Hillebrecht recommended that Plaintiff remain out of work pending the results of an upcoming

neuropsychological evaluation.  (*Id.*)

On August 1, 2019, Drs. Greco and Hillebrecht issued a second letter in response to the combined results of the two neuropsychological evaluations conducted at NRS.  (A.R. 1023.) The doctors opined that, due to her cognitive deficiencies, Plaintiff "will have difficulty with independent activities of daily living, managing finances, adjusting to unexpected changes, remembering daily schedule and important things, general/sustained attention, processing speed, visual reasoning, verbal learning, remembering work procedures, following short, simple instructions, carrying out detailed instructions, following routine without supervision, making simple work related decisions, asking for help, and responding to changes in the work setting." (*Id.*)

On August 23, 2019, Dr. Piotrowski completed a disability report in which she opined that Plaintiff was "totally and permanently disabled and no longer able to perform . . . her assigned job duties" due to "cognitive dysfunction secondary to neurotoxic intervention for treatment of her lymphoma."  (A.R. 912.)

Prior administrative findings of fact made by state agency consultants indicate that Plaintiff is capable of a full range of light work.  (A.R. 31.)  On June 26, 2019, Plaintiff was deemed "not disabled" because "the evidence shows that the individual has some limitations in performance of certain work activities; however, these limitations would not prevent the individual from performing past relevant work as a/an special education teacher."   (A.R. 72.)   Upon reconsideration, on August 7, 2019, Plaintiff was determined to be capable of unskilled, light work, being "able to understand/execute simple instructions" and "relate/adapt in routine work settings."  (A.R. 85.)

B. **Review of Testimonial Evidence**

   i. **Plaintiff's Testimony**

At the outset of the April 30, 2021 hearing, Plaintiff's counsel represented that the record was complete, and the ALJ admitted Plaintiff's medical records and other exhibits. (A.R. 44.) Subsequently, the ALJ stated for the record that Plaintiff's impairments under consideration included: non-Hodgkin's lymphoma, Stage 4; cognitive dysfunction from chemotherapy, lupus; Sjogren's syndrome; anxiety disorder, and ADHD. (A.R. 45.)

Plaintiff first testified that she is college-educated and had previously worked as special education schoolteacher until the onset of her alleged disability on June 25, 2018. (A.R. 46.) Plaintiff also stated that in 2019 she received about $53,979 from her previous employer's catastrophic illness fund due to her alleged disability. (*Id.*) Explaining to the ALJ why she could no longer work, Plaintiff stated that she experiences "memory problems," "slow processing issues," "comprehension problems," and "anxiety problems." (A.R. 47.) Plaintiff further stated that she is also limited physically, as she does not sleep well at night and is consistently tired throughout the day. (*Id.*)

Plaintiff next responded to questioning by her attorney. Plaintiff testified that she regularly experienced joint stiffness and swelling in the morning, particularly in her back and knees, and that she has difficulty sitting for extended periods. (A.R. 48.) Plaintiff stated that she understands these symptoms to be the result of lupus and that, consistent with the advice of her rheumatologist, she tries to either walk or exercise every day. (*Id.*) Plaintiff further testified that the impact of her cognitive problems on her daily life is often dependent on the task at hand. For instance, Plaintiff explained that she tries to limit the amount that she drives, noting that she has missed highway exits and forgotten where she parked her car. (A.R. 49–50.) Plaintiff also has

trouble following along with cooking recipes and will often rely on her husband or pre-made meals. (*Id.*)  According to Plaintiff, these were not tasks that caused her any difficulty prior to her alleged disability.  Similarly, Plaintiff stated that she had difficulty signing up for a website online, reading and comprehending a book, and reading subtitles on television shows. (A.R. 51.) Plaintiff's comprehension issues also affected her previous work as a teacher.  Plaintiff testified that she was "saying kids' names wrong" and "saying numbers wrong," ultimately resulting in her "teaching math wrong." (A.R. 53.)  Plaintiff concluded her testimony by emphasizing that she regularly experiences fatigue and that she consistently relies on others, such as her husband, son, and friends, for assistance. (A.R. 54.)

### ii. Vocational Expert's Testimony

The Vocational Expert, Michele Erbacher ("VE"), first classified Plaintiff's past work as a seventh-grade math resource teacher, which has a DOT title of Teacher Resource, DOT code of 099.227-042, and is skilled position, performed at a light exertion level with a specific vocation preparation ("SVP") of 7. (A.R. 55.)  The VE also noted that, in the written work history report, Plaintiff stated that she performed the job at a light exertion level. (*Id.*)

The ALJ then asked the VE to consider the following hypothetical:

> [R]estricted to light work, except never climbing ladders, ropes or scaffolds, must avoid all exposure to hazards such as machinery and heights, is able to understand, remember and carry out simple instructions, restricted to work involving few, if any workplace changes and occasional decision-making.  Can an individual with these restrictions perform the claimant's past work?

(A.R. 57.)  The VE replied that such limitations would preclude Plaintiff's past work, but that there are unskilled, light exertion level jobs in the national economy that such an individual would be able to perform, including: (1) routing clerk, which has a DOT code of 222.687-022 and is performed at a light exertion level with an SVP of 2; (2) merchandise maker, which has

8

a DOT code of 209.587-034 and is performed at a light exertion level with an SVP of 2; and (3) photocopying machine operator, which has a DOT code of 207.685-014 and is performed at a light exertion level with an SVP of 2. (*Id.*)

In response to additional questioning by the ALJ, the VE testified that if the hypothetical individual would need to be off task for 15 percent of the workday day above normal breaks, then that would "preclude those three occupations" and likely "all work in the competitive labor market." (A.R. 58–59.) The VE further stated that absence from work on two or more days per month would be similarly preclusive. (*Id.*) Plaintiff's counsel did not pose any questions to the VE.

## C. ALJ Decision

On June 14, 2021, the ALJ issued a written decision analyzing whether Plaintiff satisfied her burden to demonstrate disability using the standard five-step process. (A.R. 21–34.) At step one, the ALJ determined that Plaintiff had not engaged in substantial gainful activity since the onset of her alleged disability. (A.R. 23–24.) At step two, the ALJ found that the Plaintiff had the following severe impairments: non-Hodgkin's lymphoma (stage 4); lupus; Sjogren's syndrome; anxiety; attention deficit hyperactivity disorder ("ADHD"); and cognitive dysfunction from chemotherapy. (A.R. 24.) At step three, the ALJ determined that Plaintiff "does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments" in the relevant CFR. (*Id.*) In so deciding, the ALJ expressly considered listings 13.05 and 14.02 with respect to Plaintiff's non-Hodgkin's lymphoma and lupus, and listings 12.02, 12.06, and 12.11 with respect to Plaintiff's mental impairments. (*Id.*) The ALJ also expressly found that Plaintiff's mental impairments did not satisfy the paragraph B criteria, noting only mild and moderate limitations. (*Id.*)

9

The ALJ then determined that Plaintiff had a residual functional capacity ("RFC") to perform light work, except Plaintiff can never climb ladders, ropes, or scaffolds and must avoid all exposure to hazards, such as machinery or heights. (A.R. 26.)  The ALJ further found that Plaintiff is able to understand, remember, and carry out simple instructions, and she is restricted to work involving few, if any, workplace changes and occasional decision making. (*Id.*)

At step four, concurring with the testimony of the VE, the ALJ found that Plaintiff is unable to perform past relevant work as a Teacher Resource. (A.R. 32.)  However, at step five, considering Plaintiff's age, education, work experience, and RFC, the ALJ determined that "there are jobs that exist in significant numbers in the national economy that [Plaintiff] can perform." (*Id.*)  Specifically, consistent with the VE's testimony, the ALJ found that Plaintiff is able to perform the requirements of representative occupations such as Routing Clerk, Merchandise Maker, and Photo Copying Machine Operator. (A.R. 33.)  For these reasons, the ALJ concluded that Plaintiff was not disabled, as defined by the Social Security Act, from June 25, 2018 through the date of decision. (*Id.*)

Plaintiff filed a brief in support of her appeal of the ALJ's decision in the District of New Jersey on June 17, 2022.  ECF No. 9 ("Pl. Br.").  The government opposed Plaintiff's appeal on August 30, 2022.  ECF No. 12 ("Def. Br.").  On September 13, 2022, Plaintiff filed her reply. ECF No. 13 ("Pl. Reply").

## II.   STANDARD OF REVIEW

On a review of a final decision of the Commissioner of the Social Security Administration, a district court "shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g); *see*

*Matthews v. Apfel*, 239 F.3d 589, 592 (3d Cir. 2001).  The Commissioner's decisions regarding questions of fact are deemed conclusive on a reviewing court if supported by "substantial evidence in the record." 42 U.S.C. § 405(g); *see Knepp v. Apfel*, 204 F.3d 78, 83 (3d Cir. 2000). While the court must examine the record in its entirety for purposes of determining whether the Commissioner's findings are supported by substantial evidence, *Gober v. Matthews*, 574 F.2d 772, 776 (3d Cir. 1978), the standard is highly deferential.  *Jones v. Barnhart*, 364 F.3d 501, 503 (3d Cir. 2004).   Indeed, "substantial evidence" is defined as "more than a mere scintilla," but less than a preponderance.  *McCrea v. Comm'r of Soc. Sec.*, 370 F.3d 357, 360 (3d Cir. 2004).  "It means such relevant evidence as a reasonable mind might accept as adequate." *Plummer v. Apfel*, 186 F.3d 422, 427 (3d Cir. 1999) (internal quotations and citations omitted). A reviewing court is not "empowered to weigh the evidence or substitute its conclusions for those of the fact-finder." *Williams v. Sullivan*, 970 F.2d 1178, 1182 (3d Cir. 1992), *cert. denied*, 507 U.S. 924 (1993).  Accordingly, even if there is contrary evidence in the record that would justify the opposite conclusion, the Commissioner's decision will be upheld if it is supported by the evidence.  *See Simmonds v. Heckler*, 807 F.2d 54, 58 (3d Cir. 1986).

Disability insurance benefits may not be paid under the Act unless Plaintiff first meets the statutory insured status requirements. *See* 42 U.S.C. § 423(c).  Plaintiff must also demonstrate the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months . . . ." *Id*. § 423(d)(1)(A); *see Plummer*, 186 F.3d at 427.  An individual is not disabled unless "his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any

other kind of substantial gainful work which exists in the national economy[.]" *Id*. § 423(d)(2)(A). Eligibility for supplemental security income requires the same showing of disability. *Id*. § 1382c(a)(3)(A)-(B).

The Act establishes a five-step sequential process for evaluation by the ALJ to determine whether an individual is disabled. *See* 20 C.F.R. § 404.1520. First, the ALJ determines whether the claimant has shown that he or she is not currently engaged in "substantial gainful activity." *Id.* § 404.1520(a)(4)(i); *see Bowen v. Yuckert*, 482 U.S. 137, 146–47 n.5 (1987). If a claimant is presently engaged in any form of substantial gainful activity, he or she is automatically denied disability benefits. *See id*. § 404.1520(b); *see also Bowen*, 482 U.S. at 140. Second, the ALJ determines whether the claimant has demonstrated a "severe impairment" or "combination of impairments" that significantly limits his physical or mental ability to do basic work activities. *Id*. § 404.1520(c); *see Bowen*, 482 U.S. at 146–47 n.5. Basic work activities are defined as "the abilities and aptitudes necessary to do most jobs." *Id*. § 404.1522(b). These activities include physical functions such as "walking, standing, sitting, lifting, pushing, pulling, reaching, carrying or handling." *Id*. § 404.1522(b)(1). A claimant who does not have a severe impairment is not considered disabled. *Id*. at § 404.1520(c); *see Plummer*, 186 F.3d at 428.

Third, if the impairment is found to be severe, the ALJ then determines whether the impairment meets or is equal to the impairments listed in 20 C.F.R. Pt. 404, Subpt. P., App. 1 (the "Impairment List"). *Id*. § 404.1520(a)(4)(iii). If the claimant demonstrates that his or her impairments are equal in severity to, or meet those on the Impairment List, the claimant has satisfied his or her burden of proof and is automatically entitled to benefits. *See id*. § 404.1520(d); *see also Bowen*, 482 U.S. at 146–47 n.5. If the specific impairment is not listed, the ALJ will consider in his or her decision the impairment that most closely satisfies those listed for purposes

of deciding whether the impairment is medically equivalent. *See id*. § 404.1526(a). If there is more than one impairment, the ALJ then must consider whether the combination of impairments is equal to any listed impairment. *Id*. An impairment or combination of impairments is basically equivalent to a listed impairment if there are medical findings equal in severity to all the criteria for the one most similar. *Williams*, 970 F.2d at 1186. If the claimant is not conclusively disabled under the criteria set forth in the Impairment List, step three is not satisfied, and the claimant must prove at step four whether he or she retains the RFC to perform his or her past relevant work. 20 C.F.R. § 404.1520(e); *Bowen*, 482 U.S. at 141.

If the claimant can perform past relevant work, the claimant is determined to not be disabled. 20 C.F.R. §§ 404.1520(e), 416.920(e); *Bowen*, 482 U.S. at 141–42. The claimant bears the burden of demonstrating an inability to return to the past relevant work. *Plummer*, 186 F.3d at 428. Finally, if it is determined that the claimant is no longer able to perform his or her past relevant work, the burden of production then shifts to the Commissioner to show, at step five, that the "claimant is able to perform work available in the national economy." *Bowen*, 482 U.S. at 146–47 n.5; *Plummer*, 186 F.3d at 428. This step requires the ALJ to consider the claimant's RFC, age, education, and past work experience. 20 C.F.R. § 404.1520(a)(4)(v). The ALJ must analyze the cumulative effect of all the claimant's impairments in determining whether the claimant can perform work and is not disabled. *Id*.

III.   **PLAINTIFF'S CLAIMS ON APPEAL**

Plaintiff contests the decision of the ALJ on two grounds. First, Plaintiff argues that the RFC is not supported by substantial evidence because the ALJ improperly rejected the medical opinions of Plaintiff's neuropsychologists as to her cognitive limitations. Pl. Br. 16–22. Second, Plaintiff asserts that the ALJ failed to account for Plaintiff's moderate limitations in

concentration, persistence, and maintaining pace in the RFC determination.  Pl. Br. 22–24.  I

find that because the ALJ rejected the medical opinions of Plaintiff's treating

neuropsychologists based on insufficient explanation and reasoning, the RFC is not supported

by substantial evidence and thus remand is warranted.

"[RFC] is defined as that which an individual is still able to do despite the limitations

caused by his or her impairment(s)." *Burnett*, 220 F.3d at 121 (quoting *Hartranft v. Apfel*, 181

F.3d 358, 359 n.1 (3d Cir. 1999)); *see* 20 C.F.R. § 404.1545(a). When a case is brought to an

administrative hearing, the ALJ is charged with ultimately determining the claimant's RFC. 20

C.F.R. §§ 404.1527(e), 404.1546(c), 416.927(e), 416.946(c). "[I]n making a residual functional

capacity determination, the ALJ must consider all evidence before him[,]" and, "[a]lthough the

ALJ may weigh the credibility of the evidence, he must give some indication of the evidence

which he rejects and his reason(s) for discounting such evidence." *Burnett*, 220 F.3d at 121; *see*

*Cotter v. Harris*, 642 F.2d 700, 704 (3d Cir. 1981). When assessing a claimant's RFC, an ALJ

must consider all of the claimant's medically determinable impairments which are supported by

the record, including those considered non-severe.  20 C.F.R. §§ 404.1545 (a)(2), 416.945

(a)(2); *see Rutherford v. Barnhart*, 399 F.3d 546, 554 (3d Cir. 2005). "Where the ALJ's findings

of fact are supported by substantial evidence, [district courts] are bound by those findings, even

if [the courts] would have decided the factual inquiry differently." *Hagans v. Comm'r of Soc.*

*Sec.*, 694 F.3d 287, 292 (3rd Cir. 2012) (internal quotation marks and citation omitted).

### A. The ALJ Improperly Rejected the Medical Opinion of Plaintiff's Neuropsychologists in Formulating the RFC

Plaintiff asserts that the ALJ committed legal error by rejecting the opinion of Plaintiff's

neuropsychologist team at NRS for invalid reasons. Pl. Br. 16–22.  Specifically, Plaintiff argues

that the ALJ's rejection of the August 1, 2019 opinion of Drs. Hillebrecht and Greco that

Plaintiff will, among other things, "have difficulties with independent activities of daily living, taking care of finances, adjusting to unexpected changes, remembering daily schedule and important things, general/sustained attention, processing speed, visual reasoning, verbal learning, remembering work procedures, following short, simple instructions, carrying out detailed instructions, following routine without supervision, making simple work related decisions, asking for help, and responding to changes in the work setting," was improper and thus the RFC is not grounded in the record evidence. *Id.* at 18 (quoting (A.R. 1023.))

"In evaluating medical reports, the ALJ is free to choose the medical opinion of one doctor over that of another." *Diaz v. Comm'r of Social Sec. Admin.*, 577 F.3d 500, 505 (3d Cir. 2009) (citing *Cotter v. Harris*, 642 F.2d 700, 705 (3d Cir. 1981)). "[W]hen a conflict in the evidence exists, the ALJ may choose whom to credit but cannot reject evidence for no reason or for the wrong reason. The ALJ must consider all the evidence and give some reason for discounting the evidence she rejects." *Id.* (quoting *Plummer*, 186 F.3d at 429 (internal quotations omitted)). Importantly, "[t]reating physicians' reports should be accorded great weight, especially 'when their opinions reflect expert judgment based on a continuing observation of the patient's condition over a prolonged period of time.'" *Plummer*, 186 F.3d at 429 (quoting *Rocco v. Heckler,* 826 F.2d 1348, 1350 (3d Cir.1987)). "An ALJ may reject a treating physician's opinion outright only on the basis of contradictory medical evidence." *Id.* (citing *Newhouse v. Heckler*, 753 F.2d 283, 286 (3d Cir. 1985)).

Here, the ALJ found that the August 2019 opinion of Drs. Hillebrecht and Greco was unpersuasive for the following reasons: (i) Plaintiff attained IQ scores of 80 and 84 in separate assessments, each of which fall in the low average range; (ii) Plaintiff's own statements about her daily activities and her consideration of volunteer work indicate functionality to perform

15

unskilled work; and (iii) Plaintiff's primary care physician noted in early 2019 that Plaintiff's concentration deficiencies were "improving on medication." (A.R. 29–31.) However, none of these reasons individually, or in totality, support an outright rejection of the medical opinion of Drs. Hillebrecht and Greco, which reflects those doctors' extensive neuropsychological assessment and monitoring of Plaintiff. Indeed, the ALJ's stated reasons fail to sufficiently explain how such evidence so undermines Drs. Hillebrecht and Greco's informed opinion in terms of "supportability" and "consistency"—the "most important factors" to consider when evaluating "the persuasiveness of medical opinions"—as to warrant rejection. *See* 20 C.F.R. § 404.1520c(a).

First, Plaintiff's IQ scores are merely one aspect of the documented results of the various neuropsychological assessments conducted by the doctors at NRS, including Drs. Hillebrecht and Greco. The NRS doctors issued reports regarding Plaintiff's neuropsychological status in July 2018 and May 2019, each of which documents significant cognitive deficiencies. (A.R. 939–52.) In July 2018, the NRS doctors found that Plaintiff suffered from "diffuse deficits consistent with cognitive dysfunction secondary to chemotherapy," including, among other things, that Plaintiff's "attention-concentration . . . was impaired," "her processing speed . . . was slow," "her mental flexibility/multitasking . . . was also impaired," "her comprehension-of-command instruction . . . was impaired," and her problem-solving skills were "significantly impaired." (A.R. 940–41.) The NRS doctors further found that Plaintiff's "memory functioning . . . was one of her most salient impairments," as even Plaintiff's "simple recall of symbols" was impaired. (A.R. 941.) Following a period of regular treatment at NRS, in May 2019, the NRS doctors found that Plaintiff's "neuropsychological findings remained unchanged" upon re-assessment. (A.R. 946.) In this respect, the May 2019 report notes similar impairments with

respect to Plaintiff's attention-concertation, processing speed, verbal reasoning, visual reasoning, and memory.  (A.R. 947-48.)  The NRS doctors concluded the May 2019 report by recommending that "[g]iven her unchanged diffuse cognitive deficits and psychological state," Plaintiff "should apply for permanent disability and not return to work as a teacher."  (A.R. 951.) Contrary to the ALJ's stated reasoning, Plaintiff's full-scale IQ scores are hardly the noteworthy features of the NRS reports.  Indeed, as noted, both reports include a comprehensive analysis of Plaintiff's decreased cognitive functioning, thus speaking to the "supportability" and "consistency" of Drs. Hillebrecht and Greco's opinion.  *See* 20 C.F.R. § 404.1520c.  While Plaintiff may have achieved IQ scores in the low average range, such scores do not provide a complete narrative of Plaintiff's cognitive abilities and may not, for instance, account for Plaintiff's memory deficiencies, which her doctors describe as her most prominent impairment. (A.R. 941.)  Importantly, as Plaintiff's treating neuropsychologists, Drs. Hillebrecht and Greco issued the August 2019 opinion regarding Plaintiff's limitations with full knowledge of her IQ scores.

Second, Plaintiff's own statements about her daily activities or intentions with respect to volunteering are not sufficient reason to reject the opinions of Plaintiff's treating neuropsychologists.  *See Plummer*, 186 F.3d at 429.  In fact, Plaintiff's statements as to her daily life actually indicate certain limitations and reliance on others for assistance, which are consistent with Drs. Hillebrecht and Greco's opinion.  According to the ALJ, Plaintiff "has more than functional activities of daily living" as "[t]here are no problems with personal care, she is able to help get her son to school; exercise; do some household chores such as laundry and vacuuming at her own pace; run errands; help with dinner; drive a car; [and] shop in stores." (A.R. 31.)  But, in her hearing testimony, Plaintiff explained that, among other things, she limits

17

her driving as a result of confusion and lack of concentration, often relies on her husband for shopping purposes, has trouble following simple cooking instructions, and is unable to multitask. (A.R. 49–52.) Accounting for the limitations Plaintiff describes, her daily activities are not without problems, as the ALJ suggests. Nor is Plaintiff's supposed desire to engage in volunteer work any indication that she is capable of full-time work. (A.R. 29.) To the contrary, Plaintiff's "sporadic and transitory activities may demonstrate not [her] ability but [her] inability to engage in substantial gainful activity." *Smith v. Califano*, 637 F.2d 968, 972 (3d Cir. 1981).

Third, in rejecting the opinion of Drs. Hillebrecht and Greco, the ALJ cites the treatment notes of Dr. Peeples from January and February 2019, which state that Plaintiff's concentration issues were "improving on medication." (A.R. 29.) However, even a cursory review of contemporaneous medical records reveals it is Dr. Peeples' opinion that is contrary to the record evidence—not Drs. Hillebrecht and Greco's opinion. At the time of Dr. Peeples' treatment notes, medical records from NRS indicate Plaintiff's continued difficulties in cognitive functioning. (A.R. 840–50.) Further, the results from Plaintiff's May 2019 neuropsychological assessment at NRS indicate that Plaintiff's cognitive functions, including those with respect to attention-concentration, "remained severely impaired," standing alone and when compared to the results of the July 2018 assessment. (A.R. 852.) In crediting Dr. Peeples' opinion over that of the NRS doctors, whose "opinions reflect expert judgment based on a continuing observation of [Plaintiff's] condition over a prolonged period of time," the ALJ relies on isolated medical evidence that belies the rest of the record. *Plummer*, 186 F.3d at 429. Notably, nothing in Dr. Peeples' treatment notes, or Plaintiff's other medical records, documents Plaintiff's purported improvements in concentration, and, in fact, Dr. Peeples' own treatment notes state that Plaintiff reported that her cognitive therapy "isn't going very well." (A.R. 869.)

18

Because the ALJ's discussion of Plaintiff's IQ scores, daily activities, and undocumented concentration improvements does not sufficiently explain why the medical opinion of Drs. Hillebrecht and Greco—Plaintiff's treating neuropsychologists—as to Plaintiff's extensive cognitive limitations was unpersuasive and should be discounted, Plaintiff's disability claim is remanded for further consideration. Although "[t]he law is clear . . . that the opinion of a treating physician does not bind the ALJ on the issue of functional capacity," *Brown v. Astrue*, 649 F.3d 193, 197 n.2 (3d Cir. 2011), here the ALJ's reliance on inaccurate and outlier record evidence to justify the rejection of a well-sourced medical opinion was manifest legal error.

**B.    Plaintiff's Challenge to the ALJ's RFC Determination Need Not Be Addressed Prior to Remand**

Plaintiff also challenges the ALJ's purported failure to account for her moderate limitations in concentration, persistence, and maintaining pace in the RFC. Pl. Br. 22–24. However, because Plaintiff's disability claim is remanded for reconsideration of the medical opinions informing Plaintiff's RFC and thus the RFC is subject to change, the Court need not address Plaintiff's remaining argument at this time. Indeed, the RFC indicates that Plaintiff "is able to understand, remember and carry out simple instructions" and engage in "occasional decision making" in the workplace. (A.R. 26, 32.) That determination appears squarely in conflict with the medical opinion warranting careful reconsideration on remand.

**IV.    CONCLUSION**

For the reasons set forth above, the ALJ's decision is **REVERSED**, and Plaintiff's disability claim is **REMANDED** for further consideration. An appropriate Order shall follow.

Date:   October 18, 2022                              /s/ Freda L. Wolfson
                                                      Freda L. Wolfson
                                                      U.S. Chief District Judge